The next case will be 09-5132. This will concern the Secretary of Health and Human Services. Ms. Brockmore Yes, Your Honor. It's Lisa Brockmore. Thank you. Good morning, Your Honors. If it please the Court. Good morning. I represent the petitioner, Dr. Broekelschen, who alleged in his vaccine petition that he had an influenza vaccine that led to transverse myelitis. Could you go ahead and speak up a little bit so everybody can hear you? Thank you, Your Honor. The special master in this case ruled against Dr. Broekelschen, stating that it was an alternative cause that actually was Dr. Broekelschen's injury. In other words, it was the vascular event. The vascular event in this case was previously ruled out by Dr. Broekelschen's treating physicians. In order to come to this decision to reject Dr. Broekelschen's petition, we had significant legal error in terms of failing to apply Alfin, failing to apply Capizano, failing to apply Walther, and then subsequently the federal claims of the court failed to apply Andrew, which was one of the newer cases that the federal circuit, this court, decided last April regarding credibility. There are several issues in regard to Alfin. Alfin, we believe, was not even applied in this case. The special master went directly to the alternative cause. Had Alfin been applied in terms of the first three prongs, we would have, there was concessions by respondents expert in regard to every single prong. The medical plausibility was conceded. The temporal association was conceded. And, in fact, a more stark concession was that, by respondents expert, was that this particular case was possibly transverse myelitis, that there was good arguments for it. Further concessions were that, in support of transverse myelitis, there were two lesions. The respondents expert absolutely conceded that the two lesions were problematical to his case. In other words, it was inconsistent with a vascular event. And one of my favorite statements by respondents expert was, in order for a vascular event to occur when you have two lesions, it was a hole in one on a par five. In addition, if proprioception existed, and we don't need proprioception, but if it did exist, then that absolutely ruled out the vascular event. All of these concessions of petitioner's case, even by respondents expert, never saw the light of day in the special master's decision. Not even discussed all of these concessions. Not only did they concede our case in Althan, but it pretty much ruled out, if we went to Walther, in regard to the alternative cause. Respondents expert concedes that it was unlikely with the two lesions. All of this should have been dispositive if Althan and then Walther was applied. But aren't you basically asking us to take the expert's reports, re-weigh them, believe one over the other, and then decide the case? That's not our function as an appellate court. That was done below by the special master, by the court of federal claims. Once that determination of factual determination is done, unless there's clear error in the analysis of those facts, how can we reverse on the basis of facts being re-weighed by us? Very good question, Your Honor. I do believe this court has the ability to do so, and in fact did do so in Andrew, in regard when you have a special master that's using credibility or demeanor as a guise in order to pick and choose evidence. Then you have a violation that is clear legal error, and this court is the appropriate court to remedy such legal error. I'm not quite sure what you mean by picking and choosing evidence, counsel. In your brief, you suggest that the special master excluded certain evidence, but I don't find in the record any evidence or any indication of what he excluded. I take it what you really are referring to is the fact that in the special master's opinion he didn't make specific reference to the particular evidence that you thought was dispositive. Is that what you're saying? Did he make rulings excluding evidence of some kind that I missed? I believe so, Your Honor. By utilizing a double standard... No, did he make rulings that excluded, are there evidentiary rulings that exclude certain evidence in the record that I missed? There were no evidentiary rulings. What occurred was he would take medical records, I think this goes to the heart of Capizano, he would take medical records in addition to the clarifying letters that were submitted that clearly stated vascular event was ruled out and that transverse myelitis secondary to an influenza vaccine was the likely diagnosis. He took those records and pretty much required more detail, more basis. There was insufficient information and therefore he, I would call it excluded, but gave it less weight. Isn't that his job to scrub the evidence, to examine the evidence, to call for more detail if he felt it was needed? I don't believe so, Your Honor. I think he routinely accorded and drew inferences routinely against petitioner in violation of Capizano. And Capizano, as well as the code section, pretty much states that you can rely on conclusions, you can rely on medical judgments. It does not say, Capizano does not say that you need certainty. Well, neither does Althan. You do not need certainty in order for a petitioner to meet its burden, the preponderance of evidence pursuant to Althan and Capizano. And this was routinely done where petitioner, all of petitioner supporting evidence required more certainty, more sufficient explanation. And if that's the new burden that treating physicians have to put down in their medical notes that, you know, what's the reason for their conclusions and their medical judgments, I would submit to this court that petitioners will never be able to meet that burden. That's a new burden that's not in Capizano. Capizano pretty much says medical notes, you know, are reliable and you should look at them and weigh them preferentially. That's probably not the right word, but they have a more reliable basis. Isn't this case a little unusual, though, counsel, because ordinarily the cases address the question of whether given a certain disease or injury that the petitioner alleges, did the vaccine cause it? And so the evidentiary arguments are with regard to the causal relationship. We're talking about off-table cases, obviously. So the evidentiary argument is about the causal relationship between the vaccine and the injury. But this case is a little different because this case has a predicate question that first had to be decided, which is, what was the injury? And how do we go about, it seems to me a lot of the cases that talk about these issues, talk about the evidentiary issues, aren't in that context. How do we go about in a case where there's a dispute as to what the injury is initially, how do we go about assessing the evidence in that case? I would submit, Your Honor, that petitioners bar, in general, apply first elephant. And then, that's to our case, did the influenza vaccine cause the transverse myelitis? Meet the three prompts. Then, pursuant to Walther, the burden then switches to respondent to show the alternative cause, in this case the vascular event. You can't apply often until you have a determined injury, though. You have to know what the injury is in order to apply the three-part test of often, because the very first step is a medical theory causally connecting the vaccination and the injury. So you've got to know what the injury is. But that's what the dispute was in this case, wasn't it? We would submit, yes, but we would submit that you first would apply often, and then you apply Walther in regard to the alternative cause. It does, I mean, this court brings up a very good point that I think the vaccine court, petitioners, and respondents at large are grappling with. And that is, when respondent alleges an alternative event, does that really go to the third, second prong of often, the logical sequence of cause and effect? And at some point in time, a line has to be drawn. And we feel, in this case, the vascular event was an alternative cause. Did we, regardless of whether we apply often and then Walther, did petitioner meet the burden by the preponderance of the evidence, even by a feather? Did we rule that out? And I would submit absolutely we did. Not only by our expert ruling out the vascular event, but by the concessions of respondent's expert that basically conceded, well, the second lesion is mighty problematical, and in fact, in order to have a vascular event in light of the second lesion would be a hole in one on a par five. And you would need the throwing of clots, which there was no medical evidence whatsoever. So, we would submit that, whether we apply often and then Walther, as opposed to, do we have to deal with a predicate, a foundational issue, petitioner, we believe, we would submit, still ruled out the vascular event. If you don't get past step one of Alton, is there any way to get around anything else? You don't get to step two and step three if you don't meet step one of Alton? Of Alton? If we don't, okay, one more time, I'm sorry. If you don't meet the requirements of step one of Alton, do you need to get to step two and step three? If we do not meet biological plausibility, do we ever even go to temporal association and logical sequence? I don't know, Your Honor. I don't believe I've ever had to deal with a case where we did not have medical plausibility, and in this case, we had sufficient evidence of medical plausibility by a very renowned expert, and medical plausibility was conceded by a respondents expert. So, we did meet, definitely, prong one. We did definitely meet temporal association. And I think the issue lied more on logical sequence and cause and effect. I'm on my time, so I'd like to reserve it. All right, we'll give you your full rebuttal time. Thank you, sir. Mr. Johnson? If you need a little extra time, you can have it, too. Thank you, sir. Good morning, Your Honors. May it please the Court. I'd first like to clear up a matter that was raised by opposing counsel in arguing that the evidence that the government submitted on the issue of the diagnosis was offered as an alternative cause. Actually, that is not accurate. Our reading of Althann is consistent with what Judge Plager was suggesting in that the identification of the underlying injury that's at issue is part of establishing the first part of the Althann test, which says that you have to prove a medical theory linking the vaccine to the injury. So, the identification of the injury is a predicate to establishing the first prong of Althann. At that point, if you cannot establish the first step of Althann, is the case over? Your Honor, we submit that it is. It's no longer necessary for the Special Master to continue on with the analysis of determining whether there was a logical sequence of cause and effect or approximate temporal relationship because there's been no reliable medical theory linking the flu vaccine, or the flu vaccine in this case, to the injury that was alleged. So, is that the case here? That is exactly the case here, Your Honor. The Special Master determined that the preponderance of the evidence supported that the injury suffered by Dr. Brokoshin was anterior spinal artery syndrome and not transverse myelitis. And he looked at the evidence, all of the evidence in the record, in terms of whether there was something that would support a medical theory linking the administration of a flu vaccine to anterior spinal artery syndrome. He considered the testimony that Dr. Steinman provided. He considered the articles that Dr. Steinman provided and simply found that there was just no medical theory provided in that evidence that linked the flu vaccine to the injury that the evidence supported. The second issue that I would like to address, and perhaps apropos of the Masters starting today, is the whole-in-one and par-five argument. Appellant has not provided, actually, a full context for that testimony. And this case involved a lot of medical evidence and a lot of tests that suggested one of both diagnoses that the experts were arguing. But Dr. Greenberg, the government's expert, testified that the angiogram showing blockage in the anterior spinal artery was such strong evidence of an ischemic event, of a vascular event, that without the MRI showing two lesions, Dr. Brokoshin's treating physicians would probably no longer have considered transverse myelitis as a possible diagnosis. However, Dr. Greenberg did admit that the MRI was problematic to his opinion, but he explained that the way that the MRI fit into his theory was if the primary clot that showed up on the angiogram was throwing off additional clots, that could have resulted in a second lesion showing up on the MRI. He did testify that this was a rare event, and that was how the whole-in-one and par-five phrase came into play. But he also testified that it was biologically plausible and that they do see this happen, and I would direct the court to pages 874-75 of the appendix. And I think it's also important to note that Dr. Greenberg testified that transverse myelitis is rare, only 1,400 cases in the United States every year. And he went on to testify that vaccine-associated transverse myelitis is exceedingly rare. So the evidence that the special master was presented with was two rare but both biologically plausible explanations for Dr. Brokoshin's condition. And what the special master decided was that because Dr. Greenberg had incorporated the MRI into his theory and offered a biologically plausible explanation for it, and because Dr. Steinle completely failed to explain how the angiogram fit into his theory that what Dr. Brokoshin had was transverse myelitis, that that was a reasonable basis for giving more weight to Dr. Greenberg's opinion. And as a factual finding that is supported by a rational basis, that's a finding that's entitled to deference by this court. The third issue that I'd like to address is the argument that the special master used credibility as a guise or as a ruse to pick and choose evidence. We submit that there is no evidence of that in the record. The special master provided an exhaustive and comprehensive analysis of the evidence. And with respect to the treating physician records and the medical records in particular, the special master explained why he gave more weight to some and less weight to others. And one of Appellant's criticisms is that he required too much detail. But in actuality, what the special master decided was that the record that was entitled to the most weight was the discharge summary prepared by Dr. Verghese. Dr. Verghese was Dr. Brokoshin's treating neurologist for a number of years. He was intimately involved with Dr. Brokoshin's treatment while he was hospitalized for his condition. And the special master reasoned that having treated Dr. Brokoshin for a number of years, having monitored his treatment while in the hospital, and then setting out a very detailed analysis of all of the tests and other evidence that was generated while Dr. Brokoshin was hospitalized, that that was the most reliable conclusion in the treating physician records. And the conclusion that Dr. Verghese provided, the final discharge diagnosis, was cervical myelopathy etiology unknown. So at that point, Dr. Brokoshin's own treating neurologist was acknowledging that there was no confirmed diagnosis and there was no confirmed or even definitive cause. They just didn't know at that point. And it was certainly reasonable and rational for the special master to find that that was the record that was entitled to more weight than others. Are you going to address the credibility question? Yes, Your Honor. I presume you're referring to the language in Andrei that was based on your dissent and Lampe indicating that expert witnesses or that special masters are not permitted to consider the credibility of expert witnesses. And we submit that that is certainly a consideration or a factor that special masters can take into consideration when evaluating an expert's testimony. It certainly can't be the only consideration, and it certainly can't be, as the court found in Andreu, used as a pretext to apply a heightened standard of proof or a heightened burden of proof. But in assessing the expert's testimony and how much weight it should be afforded, an expert witness is just like any other witness, their demeanor on the stand, their candor, their willingness, as the special master found in this case of Dr. Greenberg, to be forthright in explaining when something was not as supportive of his opinion as other evidence. Those are certainly things that can be considered. And specifically with an expert, as in this case, the qualifications which go to credibility can be taken into consideration. Qualifications go to credibility, assuming a certain minimum threshold of qualification has been met, which it was met in both cases. This is not a case where you have an MD versus a dentist testifying about medical problems, is it? Absolutely, Your Honor. That is correct. So this is a case where you have two reasonably fully qualified doctors. Is their background and their training a question of credibility for the special master to determine? Your Honor, I think whether it goes to the credibility or it goes to the reliability, either way it is a factor that can be used to determine the weight. I'd be more comfortable if it went to something like persuasiveness of the argument, taking into account the experience and background, but credibility makes me a little uncomfortable. And actually the special master in this case is more in line with what you're suggesting because he did not use the term credibility in discussing the qualifications of these experts. He found both to be very impressive and very well qualified. The fact that tip the scales for Dr. Greenberg being more persuasive was the fact that he worked at the world's only center dedicated to diagnosing and treating patients with transverse myelitis. The special master also said he thought that he was more forthcoming. What does that mean in terms of credibility? When you're dealing with expert witnesses, not with testimony about whether the light was red or green and you have one person saying it was red, the other person saying it was green, and then you look at the two witnesses and you say, boy, that witness is not very credible. That's okay, isn't it? But is it okay to look at two experts and say, I don't like his or her demeanor, so I'm not going to credit that testimony? The only clue that the special master provides in his decision is that he felt that Dr. Greenberg was more forthcoming. And he doesn't, you're correct, provide a detailed explanation for why he found Dr. Greenberg to be more forthcoming. But I think you can infer from the special master's decision that Dr. Greenberg's willingness to admit that the MRI was not, that that evidence probably weighed, standing in isolation, weighed in favor of the diagnosis of transverse myelitis, but went on to explain how it could still be consistent with anterior spinal artery syndrome as compared to Dr. Steinman, who was simply willing to dismiss the angiogram findings altogether. He never incorporated those findings into his opinion. And so based on that, I think it's reasonable to conclude that that may have been what the special master was referring to. But I don't want to give too much importance to this particular aspect of the special master's decision, because what's clear from the majority of the decision is that... He had three other issues. This was not the reason he decided that Dr. Steinman... I would have thought from our recent cases that the question of credibility, as it applies to expert witnesses, was pretty well worked through. Do you sense that we need to say anything further to clarify that for the benefit of the Court of Federal Claims judges? Not at all, Your Honor. I think that the Court's recent decision in Mobray clarifies what the Court's position is on the special master's ability to take credibility into consideration. Isn't that always the case, though, when you have two experts who are dueling on the same evidence, trying to come up with a proper interpretation? Is there any time that the Court should look at credibility of the experts? I don't think the Court is required to look at credibility, but as we cited in our brief, the Markman case, which is a United States Supreme Court case, a patent case, actually, the Supreme Court held in that case that sometimes when experts' logic on the substance is in equipoise, that sometimes credibility determinations can be the factor that tips the scale. So I don't think that the Court is required to look at credibility, but it certainly is a factor that can be taken into consideration in the overall evaluation of the persuasiveness of the opinion. Oh, because experts are what? They're hired by their respective parties to testify on issues which will assist them in establishing their case. They're not going to hire someone who's not going to be on their side. Typically, that's the case, yes. Well, that's what happens in the real world. So in that particular situation, is there any reason for even considering credibility of the witness, except for the one particular aspect where there could be an equipoise? I think that the cases obviously probably place more emphasis on evaluating the evidentiary basis for the expert's opinion. That probably should be the focus of the decision, as it was in this case. But I don't think that a rule—I don't think that the cases support a rule that a special master is never permitted to consider the credibility of an expert witness. Well, I think the aspect, the general aspect, would be that the special master or any trial court should be looking at the credibility of the witness, expert or otherwise. And I think the case law supports that. And unless the court has any further questions, we would ask that the court affirm the decision of the Court of Federal Claims, affirming the decision of the special master. Thank you. Thank you. Mr. Buckmore? Do you think there's some ambiguity in our law with regard to the credibility of expert witnesses at this point? I think Moberly cleared things up. At the time that our briefs were due, Andrew and Moberly were not in existence at the time. And when Andrew was decided, it provided some question as to whether or not expert witnesses should be—whether the credibility issues apply to experts. And I think Moberly cleared that up. I still don't believe that in this case there was a reasonable or rational basis to even mention credibility in this case. Much why I say that the weight was tipped in favor of Dr. Greenberg, respondent's expert. He had significantly less experience. And both experts, I would say, were—had significant experience with transverse myelitis. I query that Dr. Greenberg really wasn't testifying in favor of transverse myelitis. It was a vascular event. So his experience in regard to transverse myelitis versus a vascular event, you know, how is he more credible in terms of testifying regarding a vascular event? That was never addressed. Just that he had more experience. But there was no evidence that he had more experience when you looked at 27-plus years of Dr. Steinman and all of his research regarding vaccinations as well as immuno-neurological issues. I don't even think credibility should have been mentioned. But it is a concern of petitioners at large that this special master kind of has a formula, so to speak, that you can see in recent cases that were decided by the Federal Court of Claims in Rotoli. And then there was a subsequent case, and it's eluding me right now, but it was decided by Dr. Leto where both Judge Firestone and Judge Leto said, your decisions with credibility are just inappropriate. They're not relevant. And then Judge Leto went even further and looked at how Special Master Moran would consistently look at the evidence that was supportive of petitioner and required more detail, more sufficient basis. And he said that was in contravention of Capizano. So there seems to be a pattern, not just in this case but in other cases decided by the same special master, that there's kind of a formula. Let's throw in credibility, whether it's relevant or not. Let's give a higher burden to petitioner in regard to the weight of the medical records where all of petitioner's records require more explanation, more basis, where the very same medical records that support respondent are the same doctors, same medical records, same conclusions. But that's fine for evidence that's supportive of respondent. So there's some disparity there. In terms of, I'd like to, you know, it was discussed that Special Master Moran found that the discharge summary by Dr. Brokerstein's neurologist was given more weight, which is fine. But that discharge summary also had conclusions in it. But if you looked at the neurologist, Dr. Verghese, who provided a clarifying letter subsequent, which is part of the record, which is part of what the special master needed to look at in terms of the totality of the record, where the very same neurologist who, you know, said in his discharge summary he did have some reservations, some doubts, go see a second opinion, to which Dr. Brokerstein did. He went to a very renowned neurologist, and that neurologist said, yes, in fact, we believe this is transverse myelitis. So then you look at the clarifying letter of Dr. Verghese, this very same neurologist that wrote the discharge summary, and that clarifying letter says, yes, this was, the final diagnosis is transverse myelitis, and it's likely that it was secondary to an influenza vaccine. And he emphasized the two lesions, the MRIs. He did not say in his clarifying letter, well, I still have reservations. This was a vascular event. But that letter never even mentioned the vascular event or the angiogram. Thank you, Your Honors. We do believe this case should be reversed. Thank you very much. Case is submitted.